1
2
3
4
5
6              IN THE UNITED STATES BANKRUPTCY COURT
7                   FOR THE DISTRICT OF ARIZONA
8
9
10  In Re                                    In Proceedings Under Chapter 7

11  GTI CAPITAL HOLDINGS, LLC, an            Case Nos. 03-07923-SSC through 03-
    Arizona limited liability company dba    07924-SSC
12  ROCKLAND MATERIALS, G.H.
    Goodman Investment Companies, LLC, an    Jointly Administered
13  Arizona Limited Liability Company,
                                             Adv. No. 07-00031
14              Debtors.
    ─────────────────────────────            MEMORANDUM  DECISION
15
    In Re                                    (Opinion to Post)
16
17  DAVID M. REAVES, as the Trustee
    of GTI CAPITAL HOLDINGS, LLC, an
18  Arizona limited liability company dba
    ROCKLAND MATERIALS, G.H.
19  Goodman Investment Companies, LLC, an
    Arizona Limited Liability Company,
20
                Plaintiffs,
21  vs.

22  COMERICA BANK-CALIFORNIA, as
    successor by merger to Imperial Bank,
23
                Defendant.
24

25  ─────────────────────────────────────────────────────

26                         **I. Introduction**

27      This matter came before the Court on Defendant Comerica's Motion to Dismiss,

28                                    1

filed March 15, 2007. The Plaintiff, Chapter 7 Trustee David M. Reaves,**[1]** filed his Response

and Motion for Partial Summary Judgment as to Liability on May 14, 2007, and the Defendant

filed its Reply and Response to Trustee's Cross-Motion on May 29, 2007. On June 8, 2007, the

Trustee filed his Reply to the Defendant's Response. Oral argument was held in the matter on

June 13, 2007, at which time the Court took this matter under advisement. In this Decision, the

Court has set forth its findings of fact and conclusions of law pursuant to Rule 7052, Rules of

Bankruptcy Procedure. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§

1334 and 157. (West 2007).

## II. Factual Discussion

On May 8, 2003, GTI Capital Holdings, LLC, an Arizona Limited Liability

company dba Rockland Materials, and G.H. Goodman Investment companies, LLC, an Arizona

limited liability company, filed their petitions for relief under Chapter 11 of the Bankruptcy

Code.**[2]** On January 19, 2007, the Debtor commenced this proceeding against the Defendant.**[3]**

On April 30, 2007, this case was converted to one under Chapter 7, and David M. Reaves was

appointed the Trustee.**[4]**

As of the Petition Date, the Defendant asserted a claim in these

Chapter 11 proceedings of approximately $17,000,000. Shortly after the petition filing date, the

Defendant represented to the Court that its claim was secured by a valid and perfected lien in

**1.** On May 7, 2007, the parties filed a Stipulation substituting David M. Reaves, the Chapter 7 Trustee, for the Debtors as the named Plaintiff.

**2.** Because of the identical interests being presented by the Debtors and their estates in this Adversary Proceeding, and because after a sale of the Debtors' assets, the proceeds were placed into one fund to be distributed to creditors, the Court shall hereinafter refer to the Debtors as "Debtor," with their estates being referred to in the singular as well.

**3.** See Dkt. Entry No. 1 in Adversary 2:07-ap-00031-SSC (hereinafter "Adversary Case").

**4.** See Dkt. Entry Nos. 1457, 1461 in Administrative case, 2:03-bk-07923-SSC (hereinafter "Administrative Case").

2

"substantially all of the assets of the Debtors."[5]   This assertion led the Defendant to proceed

with a number of motions, requesting immediate relief.   On June 19, 2003, based on said

representations and the Debtor's mismanagement of its operations, the Defendant filed a motion

to appoint an examiner, which was opposed by the Debtor.   After the Court conducted a hearing

on the Defendant's Motion, Edward M. McDonough (the "Examiner") was appointed.   The

Defendant continued to pursue aggressive actions to make sure that it received adequate

protection payments and to ensure that the Examiner's powers were expanded.   For instance,

based partially on the Defendant's representations of its security interest, made at the

commencement of the case and reasserted by the Defendant, the Court ordered the Debtor in

September 2003 to make monthly adequate protection payments to the Defendant.   The

Defendant also sought and obtained the expansion of the Examiner's powers so that the

Examiner had the power to, among other things, prosecute causes of action on behalf of the

estate, and sell the Debtor's assets.[6]   However, it is also clear, based upon the evidence

presented at a separate trial, that the Defendant knew by October 2003 that its claim was

undersecured.[7]

       In February 2004, the Examiner sold the Debtor's material tangible assets,

including the Defendant's claimed collateral.   Thereafter, as a result of a number of proceedings,

the Court allocated the sum of $950,000 to the "Deer Valley Property," an asset of the Debtor

which was sold in February 2004 by the Examiner.   The Defendant had no lien on the Property,

even though up to the point of the sale, it had not modified its representations to the Court, made

at the commencement of the case, that it had a perfected security interest on substantially all of

---

**5.**  See Administrative case, "Objection of Comerica Bank-California to Debtor's
Emergency Motion for Interim Authorization to Use Cash Collateral," Dkt. Entry No. 10; see
also "Declaration of Larry King," Dkt. Entry No. 11.

**6.**  See Administrative Case, Dkt. Entry Nos. 73 and 199.

**7.**  See Administrative Case, "Memorandum Decision Regarding Surcharge," Dkt. Entry
No. 1232, at p. 14.

3

1    the Debtor's assets.

2         In April, 2004, the Examiner filed an adversary proceeding against the Defendant,

3    Adversary No. 2:04-ap-00676-SSC, in which he sought to avoid the Defendant's lien in certain

4    rolling stock (the "Rolling Stock Litigation") worth approximately $1,010,851. Despite having

5    repeatedly sought expansion of the Examiner's powers, and despite the Defendant's counsel

6    having consented to the Examiner's pursuit of the Rolling Stock Litigation on behalf of the

7    estates, the Defendant changed its position, and asserted that the Examiner lacked standing to

8    initiate the Rolling Stock Litigation.

9         When it became apparent that the Examiner could indeed prosecute an action

10   against the Defendant, the Defendant's internal litigation counsel examined the merits of the

11   action. Attached as Exhibit "B" to the Complaint in this adversary proceeding is an internal

12   memorandum from the Defendant's files, issued on June 25, 2004, approximately one month

13   after the Defendant had filed its Answer in the Rolling Stock Litigation. However, this

14   memorandum did not come to the attention of the Court and the interested parties in the

15   bankruptcy proceedings until almost a year later during the course of a lengthy trial on the

16   surcharge issue.[8] Of concern to the Trustee is that the memorandum stated that the Defendant's

17   in-house counsel saw "no likelihood of [its] being able to defeat [the Rolling Stock Litigation]

18   claim," and advised certain high-ranking officers of the Defendant that it would be "cheaper" to

19   settle the Rolling Stock Litigation than to defend it. Despite this internal memorandum, the

20   Defendant pursued the litigation, continually denying liability. This Court's Memorandum

21   Decision of January 5, 2005 (the "Rolling Stock Decision"),[9] held in favor of the Examiner, as

22   the Defendant's internal memorandum had predicted; however, the Defendant appealed the

23   decision to the Ninth Circuit Bankruptcy Appellate Panel (the "Panel"), incurring mounting

24

25        **8.** A detailed discussion of the surcharge litigation is set forth hereinafter.

26        **9.** See Adversary Case No. 2:04-ap-00676-SSC (hereinafter "Rolling Stock Adversary")
27   at Dkt. Entry No. 21.

28                                                4

litigation costs for the Debtor's estate, although it apparently knew it had no chance of prevailing.

During the course of the Rolling Stock Litigation appeal, the Examiner filed a motion to dismiss the appeal, in part, on the basis of the Defendant's bad faith conduct. In its Order of April 26, 2005,[10] the Bankruptcy Appellate Panel concluded that the appeal should proceed, denying the Examiner's motion to dismiss. However, this Court can discern no final conclusions drawn by the Panel as to the issue of bad faith. Rather, the Panel stated that any motion for sanctions was denied without prejudice and might be considered after a ruling on the merits in subsequent litigation. The Panel specifically refused to consider some of the allegations of bad faith, because they were predicated on certain orders of the Bankruptcy Court, which had been entered only after the appeal on the Rolling Stock Litigation had already commenced. For instance, the Defendant's internal memorandum, stating that its counsel knew the Rolling Stock Litigation would not end in its favor, was not presented to the Court until almost a year later in subsequent litigation. See B.A.P. Order of April 26, 2005, at 2.

Ultimately the Court's Decision in the Rolling Stock Litigation was upheld. Even in the Panel's final order, entered on September 7, 2006, concerning the appeal, this Court finds no analysis by the Panel on the issue of the Defendant's bad faith.[11] There was no final judgment on the merits of the Examiner's allegations of the Defendant's inequitable conduct.

Furthermore, although the Defendant never obtained a stay of judgment in the Rolling Stock litigation, it objected to the Examiner's efforts to make an interim distribution of the more than $1 million in proceeds representing the rolling stock assets. The Debtor's estates incurred still higher administrative expenses in responding to this objection, and the objection the Defendant filed to the distribution of the proceeds of the Deer Valley Property.

---

**10.** See Rolling Stock Adversary, Dkt. Entry No. 42.

**11.** See Rolling Stock Adversary, Dkt. Entry No. 40

5

After the sale of the Debtor's assets in February 2004, the Defendant consented to the Examiner thoroughly analyzing and attempting to resolve the administrative expenses then asserted against the bankruptcy estate. An extensive protocol was developed by the Examiner which required the various claimants to discount their claims. The Defendant and its counsel were kept apprised of the negotiations and the overall process; however, the Defendant never objected to any of the settlements the Examiner reached. No later than May 14, 2004, another of the Defendant's internal memoranda reflects that it knew that the Debtor's estate had at least $2.0 million in post-petition administrative expenses that would dilute the Defendant's recovery as a creditor in the case. The May 14 memo indicates that the Defendant was awaiting the outcome of the Examiner's negotiations with various administrative claimants so that it would know how far diluted its recovery would be.

On or about July 1, 2004, the Defendant and the Examiner executed a term sheet (the "Term Sheet") that set forth the material terms of an agreement between the Defendant and Examiner, acting on behalf of the Debtor's estate, regarding settlement of the administrative claims. The Defendant later breached the Term Sheet in July 2004, causing extensive litigation in the Chapter 11 cases. The Debtor and Examiner almost immediately filed motions to surcharge Comerica's collateral for certain administrative expenses totaling approximately $2,700,000 (the "Surcharge Litigation").

At the September 2, 2004 hearing on the Surcharge Motions, counsel for the Debtor argued that the surcharge and equitable subordination issues were the same and should be heard at the same time.[12] The Court stated that the issue of equitable subordination was not before it, and that the Court could not, <u>sua sponte</u>, consider an equitable subordination issue when no complaint had been filed by any interested party. The Court also concluded that it could not render a final decision on an equitable subordination claim as quickly as it could on

---

**12.** <u>See</u> Tr. of September 2, 2004 Hearing at 11-12, 51-52, attached as Exhibit 2 to the Trustee's Response at Adversary Case No. 2:07-ap-00031-SSC Dkt. Entry No. 7.

6

the surcharge issue and that different witnesses and evidence would need to be considered by the Court. Inasmuch as the creditors of the estate wanted to ascertain, as quickly as possible, whether any administrative expenses could be surcharged against the Defendant's collateral and, hence, whether, and to what extent, they would be paid on the settlements that they had entered into with the Examiner, the Court concluded that if the Debtor, or some other interested party, wanted to pursue equitable subordination, that claim would be set forth in a separate adversary proceeding. As a result, the Court rejected the offer of Debtor's counsel to file an equitable subordination claim with a motion to consolidate the subordination claim with the Surcharge Motions. Rather, the Court informed the parties that equitable subordination was a different issue that would be dealt with at a different time. Therefore, the parties were specifically precluded by the Court from litigating equitable subordination in the context of the Surcharge Litigation.

After a lengthy trial, the Court ruled in favor of the Examiner and the Debtor. The Court issued its November 21, 2005 Memorandum Decision (the "Surcharge Decision"),[13] which the Defendant appealed to the Bankruptcy Appellate Panel. Ultimately the Court's Decision was affirmed.

The Trustee also asserts that the Defendant followed a course of conduct of repeatedly objecting to the attorneys' fees and costs of the Examiner and his counsel incurred on various tasks that the Defendant requested that the Examiner undertake. Although not dispositive of the issues before this Court in this Adversary, the Trustee argues that it reflects the Defendant's bad faith during the course of these proceedings. No concern was expressed by the Defendant at the time the initial services were rendered by the Examiner and his counsel, nor at the time that the Defendant requested that the Examiner's powers be expanded. Rather, it was only when the Defendant disavowed the terms and conditions of the Term Sheet that it started to

---

**13.** See Administrative Case, Dkt. Entry No. 1232.

question the fees and costs incurred by the Examiner and his counsel.  There is no doubt that the bankruptcy estate has incurred substantial litigation costs in connection with these fee disputes and other litigation involving the Defendant.

The findings of this Court and the Bankruptcy Appellate Panel rendered in prior litigation form the backbone of the present Complaint, which alleges four counts: Count One alleges breach of contract relating to the Term Sheet; Count Two alleges breach of the implied covenant of good faith and fair dealing, again in connection with the Term Sheet; Count Three requests that the Defendant's claim be equitably subordinated pursuant to 11 U.S.C. § 510(c); and Count Four requests the Defendant return any adequate protection payments it received relating to property on which it was later determined that the Defendant lacked a valid lien.

### III.  Legal Discussion

The Trustee's Complaint is a lengthy one, and raises serious, disturbing allegations.  The Defendant has set forth five grounds on which it asserts the Complaint should be dismissed: 1) Failure to state a claim with legally sufficient facts; 2) Estoppel; 3) Waiver; 4) Res judicata; and 5) Collateral estoppel.  The Trustee countered with a Response to the Motion to Dismiss, but also with a Motion for Partial Summary Judgment as to Liability regarding the equitable subordination claim in the Complaint.

A.  Motion to Dismiss

The Defendant's Motion to Dismiss is under Fed.R.Civ.P. 12(b)(6), Fed.R.Bankr.P. 7012(b), in which "[a]ll allegations of material fact [in the Trustee's Complaint] are taken as true and construed in the light most favorable to the non-moving party."  DeGrassi v. City of Glendora, 207 F.3d 636 (9th Cir. 2000); Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar, 179 F.3d 1244 (9th Cir. 1999); Eneso Corp. v. Price/Costco Inc., 146 F.3d 1083 (9th Cir. 1998); In re Fresher, 846 F.2d 45, 46 (9th Cir. 1988).  For the Defendant to succeed on

Case 2:07-ap-00031-SSC    Doc 13    Filed 08/30/07    Entered 08/30/07 14:13:25    Desc
Main Document    Page 8 of 33

this Motion, "it must appear to a certainty that the [Trustee] would not be entitled to relief under any set of facts that could be proved. . ." <u>Western Reserve Oil of Gas v. New</u>, 765 F.2d 1428, 1430 (9th Cir. 1985). The Court addresses each of Comerica's allegations in turn.

<u>1. Failure to state a claim with legally sufficient facts.</u>

The Defendant alleges that all four Counts in the Complaint fail to state a claim upon which relief could be granted. As to Counts One and Two, the Defendant alleges that in order for a contract and the accompanying covenant of good faith and fair dealing to be breached, a contract must exist.

The Defendant argues that the Term Sheet was not a contract, but was merely a proposed agreement. The Trustee submitted the Term Sheet, signed by both a Vice President of the Defendant and the Examiner, as Exhibit "A" to his Complaint. The document is titled, "Term Sheet for Settlement of Disputes between Edward M. McDonough, in his capacity as the Examiner in the Chapter 11 Cases; and Comerica Bank." It states, "The parties contemplate an agreement containing the following essential terms," and sets forth such terms, including the various actions each party agreed to take, and Exhibits showing the various claims the Examiner had or would settle. Although the Term Sheet had to be noticed out to the creditors and other interested parties of the bankruptcy estate, at least the Examiner and the Defendant had entered into an agreement to resolve the dispute between themselves.

When considering a Rule 12(b) motion to dismiss, the Court must take all material allegations in the Complaint - for example, that a contract existed - as true. <u>In re Fresher</u>, 846 F.2d 45, 46 (9th Cir. 1988). Furthermore, the Defendant has not shown to a certainty that the Trustee would not be entitled to relief under any set of facts that could be proven. The Trustee has presented enough to show that the Defendant entered into an agreement with the Examiner and that the Defendant breached that agreement.[14] As such, a claim under a

---

**14.** <u>See</u> Memorandum Decision of November 21, 2005 at 35.

contact may have existed.  See Western Reserve Oil of Gas v. New, 765 F.2d 1428, 1430 (9th Cir. 1985).  Therefore, the Court is unable to dismiss Counts One and Two on the basis that the Trustee has failed to state a claim therein.

The Defendant asserts that Count Three fails to state a claim because the behavior alleged is not egregious enough to warrant equitable subordination.  In many instances, the Defendant's actions throughout the litigation before this Court and the Panel, and its behavior outside the courtroom, were undertaken in bad faith.  Although an equitable subordination claim is difficult to prove, and more than bad faith must be shown, the Defendant has not demonstrated to a certainty that the Trustee would not be entitled to relief under any set of facts that could be proven.  Count Three cannot be dismissed on the ground that it fails to state a claim.

Finally, the Defendant asserts that Count Four should be dismissed because none of the adequate protection payments made to it were allocated to the rolling stock or any other equipment.  It bases this assumption on the Examiner's Declaration that the adequate protection payments "appeared" to have been made only "on account of Comerica's claim that its real estate (mines) and personal property (non-rolling stock) were depreciating assets."[15]  In the same Declaration, however, the Examiner states the opinion that the Defendant was overpaid for its adequate protection.  Indeed, in his Complaint, the Trustee seeks not to recover only adequate protection payments made on behalf of the rolling stock, but rather "any and all other over-payments of adequate protection."  Complaint, ¶ 70.  Given that this is a Motion to Dismiss, the Court is unable to conclude on this record that there is no set of facts that would allow the Trustee to recover all, or a portion of, the adequate protection paid to the Defendant.

Although the Defendant asserts that the claim for "any and all other over-payments of adequate protection" is too vague to give fair notice of the claim against it, the Court will not dismiss Count Four on this ground either.  The Defendant has access to the same

---

**15.**  See "Declaration of Edward M. McDonough, Examiner, Regarding Adequate Protection Payments," Docket Entry No. 1163 in the Administrative Case.

10

cash collateral orders and Examiner's reports as the Trustee; and presumably, having been the party to have received the adequate protection payments and having access to its own accounting records, it is in a better position than the Trustee to ascertain whether it has been overpaid and by how much. Thus, it is unclear why the Defendant "is unable to determine whether the claim regarding unidentified adequate protection payments is valid."

The Court declines to dismiss Count Four, because the Trustee should have an opportunity to explore to which assets the adequate protection payments were applied and whether those payments were excessive in light of the avoidance of, or the failure to perfect, the Defendant's alleged security interest in the Deer Valley Property and the Rolling Stock, and the Trustee's request for a return of any overpayments related to adequate protection is not too vague to give fair notice.

### 2. Estoppel.

The Defendant asserts that the Trustee is estopped from asserting Counts One and Two of the Complaint, because it alleges that the Debtor actually opposed Court approval of the Term Sheet, and the Defendant relied, to its detriment, on the Debtor's opposition to the Term Sheet.

Equitable estoppel applies when (1) the party to be estopped knows the facts; (2) the party intends its conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe the conduct is so intended; (3) the party asserting the estoppel was ignorant of the true facts; and (4) the party asserting the estoppel relied on the other party's conduct to its detriment. In re Tran, 309 B.R. 330, 337 (9th Cir. B.A.P. 2004); U.S. v Hemmen, 51 F.3d 883, 892 (9th Cir. 1995). Under Arizona law, a party seeking to estop another must show (1) conduct by a party that induces another to believe in certain material facts, (2) which inducement results in acts of justifiable reliance thereon, and (3) the resulting acts cause injury. In re Famous Rests., Inc., 205 B.R. 922, 938 (Bankr.D.Ariz. 1996), citing Heltzel v. Mecham Pontiac, 152 Ariz. 58, 730 P.2d 235 (1986). Under either standard, the Defendant has not shown a basis for

11

equitable estoppel.

There is no evidence that the Defendant relied to its detriment on any "misleading" conduct of the Debtor. See <u>Walker v. Lightfoot</u>, 124 F.2d 3, 6 (9th Cir. 1941) ("[E]stoppel is applied where a party, by his conduct, misleads another who relies on the facts indicated by such conduct to the latter's disadvantage.") The Defendant has not shown that it was ignorant of the true facts, which presumably were that the Debtor believed that the Term Sheet was an actual agreement between the Examiner and the Defendant. Nor does the Defendant show that it justifiably relied on any conduct by the Debtor and was injured thereby. Also, although it alleges it would have acted differently had it known the Term Sheet would not be approved, it was the Defendant's, not the Debtor's, actions which resulted in a breach of the Term Sheet. The Defendant has not shown how the failure of the Term Sheet to receive final Court approval had any effect on the Defendant's course of action or caused the Defendant to alter its course of action which is never specifically asserted. The Defendant has not demonstrated any injury or detriment to it in any way.

The Defendant also states that it is unfair to allow the Trustee to rely on the Term Sheet in alleging breach of an agreement, when the Examiner and Debtor had, at one point in the litigation, opposed approval of the Term Sheet.[16] First, it was the Examiner, not the Defendant, who initially moved for the approval of the Term Sheet.[17] The record also shows that the Debtor's opposition to the Court's approval of the Term Sheet was limited to whether the Term Sheet should constitute the entirety of the Court-approved settlement agreement. It was only after the Examiner and the Defendant attempted to place the Term Sheet into a settlement agreement, with a concomitant motion to the Court to approve same, that the Examiner learned that the Defendant wanted to change the essential terms in the agreement. The Examiner then

---

**16.** <u>See</u>, <u>e.g.</u>, Administrative Case, Dkt. Entry No. 813, 838.

**17.** See Administrative Case, Dkt. Entry No. 796.

expressed concern that the Defendant had changed its position, and the settlement was no longer as the Examiner had negotiated. The Debtor never asserted that the Term Sheet was not a contract, nor did the Debtor oppose the Examiner entering into an agreement with Comerica consisting of the terms the Examiner originally agreed to in the Term Sheet. Accordingly, the Trustee is not estopped from asserting Counts One and Two, since it is the Defendant's conduct which lead to a breach of the Term Sheet.

### 3. Waiver.

The Defendant also alleges that the Trustee waived the ability to bring Counts One and Two when the Debtor opposed the Court's approval of the Term Sheet. As noted above, the Debtor asserted only a limited objection to the Term Sheet, and it was the Defendant's conduct that ultimately led to a breach of the agreement reached with the Examiner. Rather, the Debtor requested that a settlement agreement, and a motion thereon, be filed with the Court.

In reviewing the case law, the Court concludes that "A waiver is an intentional relinquishment or abandonment of a known right or privilege." U.S.v. Amwest Surety Ins. Co., 54 F.3d 601, 602-03 (9th Cir. 1995). "An implied waiver of rights will be found where there is 'clear, decisive and unequivocal' conduct" indicating an intent to waive certain legal rights. Under Arizona law, a waiver will be found only when a party conducts itself in a way that shows clear and intentional relinquishment of the right; "[d]oubtful cases will be decided against waiver." Goglia v. Bodnar, 156 Ariz. 12, 19, 749 P.2d 921, 928 (Ariz. App. 1987); see Meineke v. Twin City Fire Ins. Co., 181 Ariz. 576, 581, 892 P.2d 1365, 1370 (Ariz. App. 1994).

In this case, the Debtor's request for clarification of the Term Sheet in no way clearly and unequivocally reveals an intention for the bankruptcy estate to abandon the right to rely upon the Term Sheet. The Examiner's efforts to place the Term Sheet in a settlement agreement, and a motion thereon, to be filed with the Court do not reflect any abandonment or intentional relinquishment of rights. Since the Trustee now seeks to recover damages or other relief concerning an agreement originally entered into by the Examiner on behalf of the estate,

13

this Court sees no basis to conclude that the bankruptcy estate has agreed to some type of waiver of any rights or remedies. The Defendant has inappropriately breached the Term Sheet to place itself in a better position to recover a greater percentage distribution on its claim from the bankruptcy estate. The Defendant's conduct should not be used as a basis to force this bankruptcy estate to forego its claims against the Defendant.

### 4. Res judicata.

The Defendant also requests that the Court dismiss Counts One, Two, and Three on the grounds of <u>res judicata</u>. This doctrine, sometimes known as claim preclusion, bars a subsequent action when "the earlier suit . . . (1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies." <u>Sidhu v. Flecto Co.</u>, 279 F.3d 896, 900 (9th Cir. 2002). Courts in the Ninth Circuit must consider four criteria in determining whether claims raised in an action were previously adjudicated: (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether the rights or interests established in the prior judgment could be destroyed or impaired by prosecution of the second action; (3) whether the two suits involved the infringement of the identical right; and (4) whether the same evidence will be presented in the two actions. <u>Id.</u> at 900.

The first two Counts of the adversary Complaint involve breach of the Term Sheet, specifically: (1) breach of contract and (2) breach of the implied covenant of good faith and fair dealing. In the Surcharge Litigation, which Comerica asserts precludes these Counts on the basis of <u>res judicata,</u> six issues were presented to the Court: (1) whether the Examiner had standing to prosecute the Surcharge Motions; (2) Whether certain professional fees could be surcharged under the cause/consent standard of Bankruptcy Code Section 506(c); (3) Whether certain professional fees could be surcharged under the objective test of Section 506(c); (4) Whether certain personal property lease claims could be surcharged under the subjective or objective tests; (5) Whether the bankruptcy estates could be reimbursed for certain

administrative expense claims that had already been paid; and (6) Whether equity and fairness dictated a different result.[18]

In essence, the Defendant is arguing a position on which it cannot succeed. Let us assume that the Court's previous conclusion that the Defendant breached the Term Sheet should be given res judicata effect, then the Court would simply enter a judgment in favor of the Trustee on the issue of liability, and then take evidence on the issue of damages. However, if the Court proceeded in such a manner, the Defendant would object, noting that the Surcharge Litigation did not include, as one of the issues to be resolved, whether the Term Sheet was, in fact, a contract on which a suit could be based and on which the covenant of good faith and fair dealing could be incorporated. In essence, forcing the Trustee to litigate this issue is actually to the Defendant's benefit.

Moreover, the Court concludes that the better analysis is to review the issues presented and determine whether the Sidhu factors apply. Although a final judgment on the merits was entered in the Surcharge Litigation, and the Trustee is certainly in privity with the Examiner and the Debtor,[19] the remaining factor as to whether the claim or cause of action is the same in this Adversary as was actually litigated in the Surcharge Litigation must be resolved in the Trustee's favor. As noted, the Sidhu decision requires four factors be considered to determine if a claim or cause of action was actually heard or determined in the prior litigation.

First, the claims raised in this litigation do not arise out of the same transactional nucleus of facts. During the Surcharge Litigation, the Examiner and the Debtor presented extensive evidence that the Defendant requested appointment of the Examiner and later requested an expansion of his powers to further the Defendant's business purpose of selling the

---

**18.** See Administrative Case, Dkt. Entry No. 1232, Memorandum Decision of November 21, 2005 at 2-3.

**19.** See In re Dominelli, 820 F.2d 313, 317 (9th Cir. 1987)(holding that for purposes of res judicata, privity exists where parties represent the same interest).

15

Debtor's business operations on a going-concern basis. The Defendant expressly or implicitly consented to or caused the Examiner's actions for which the Defendant received a direct, quantifiable benefit. Whether viewing the issues from an objective or subjective standard, the Debtor's assets upon which the Defendant had a perfected security interest, in part, should in fairness and equity be utilized to pay the administrative expenses of this estate, administrative expenses which were caused or consented to by the Defendant. As a part of this analysis, the Court concluded that the Defendant had breached the Term Sheet entered into with the Examiner by inserting additional terms which were not negotiated with or agreed to by the Examiner. However, the context of the Court's analysis was whether the Defendant's collateral should be surcharged to pay the fees and costs of the Examiner.

In contrast, the nucleus of facts to be considered on a breach of contract claim or a breach of the implied covenant of good faith and fair dealing is very different and may include whether there was a meeting of the minds between the parties or what was the parties intent, the terms and conditions of said agreement, whether any additional terms and conditions may be implied by law, what actions lead to a breach of the contract, whether those actions were taken in good faith, and whether the party breaching the agreement should be responsible for the damages flowing therefrom. For instance, a monetary breach of the contract may be a separate from a breach of the implied covenant of good faith and fair dealing. It is also possible that parties may enter into a contract, but subsequent external market factors may cause one party to breach an agreement even though both parties are proceeding in good faith. Given these considerations, the facts to be considered on a breach of a contract or a breach of the covenant of good faith and fair dealing are far different than what would be presented at a trial as to whether certain collateral should be surcharged.

Second, the rights or interests established in the Surcharge Litigation will not be destroyed or impaired by the prosecution of these claims. The Court's conclusion in this Adversary will not vitiate this Court's conclusion in the Surcharge Litigation. In essence the

rights or interests of the parties, as a result of the Surcharge Litigation Decision, allow the administrative claimants of this estate to be paid from the Defendant's collateral, or the proceeds thereof, or from the unencumbered assets of this estate. If the Trustee is successful with Counts One and Two of this Complaint, however, the improper conduct of the Defendant will lead to a separate in personam judgment against the Defendant which will be paid from its assets – not property of this estate. Such direct or personal liability of the Defendant is a completely separate and distinct issue.

From such an analysis flows the next concept. The Trustee's Complaint, because it is seeking a personal judgment against the Defendant, and not just requesting that certain assets of the Debtor, upon which the Defendant claimed it had a perfected security interest, be utilized to pay the administrative expenses which the Defendant caused or to which it consented, cannot involve or infringe on an identical right, which is yet another Sidhu factor. The bankruptcy estate has not had an opportunity to litigate the rights and benefits which would have flowed from the underlying Term Sheet, as a contract. If the Examiner and the Defendant had fully performed under the Term Sheet, as drafted, it is possible that all $8 million in proceeds from the sale of the Debtor's assets would have been immediately distributed to all creditors of this estate, causing this case to be closed in roughly July 2004. What percentage of all claims would have been paid in full at that time? What percentage of the claims will be paid now? What expenses have been created or continue to accrue as a result of the breach of the Term Sheet? This Court has simply not considered or resolved these issues. In the Surcharge Litigation, certain administrative expense claimants performed numerous services or took concrete action to allow the Defendant to recover and liquidate its collateral. In fairness and equity, those claimants should be compensated from the collateral that they recovered for the benefit of the Defendant. Now the Trustee is stating that separate conduct of the Defendant, which has not yet been fully presented to the Court, warrants that the Defendant be held directly responsible through a separate judgment which may only be paid from the assets of the

17

1  Defendant, not the Debtor or this estate.[20]

2         Finally, and as outlined above, because the Court is now considering whether the

3  Defendant should be personally liable for its breach of the Term Sheet, the evidence to be

4  presented by the parties will be completely different. The evidence to be presented on the issue

5  of consent or cause, which would allow the collateral of the Defendant to be utilized to pay those

6  administrative expenses, is far different from the evidence to be presented concerning the intent

7  of the parties, whether the Term Sheet constituted a contract, whether there was a breach of said

8  contract, if one existed, whether there was any covenant of  good faith and fair dealing implied

9  in the Term Sheet, whether there was a breach of said covenant, whether any damages flowed

10  from a breach of the contract and/or the covenant, and whether the Defendant should be

11  personally liable for any such breach.  Quite simply, because all of the factors have not been

12  shown, the Court sees no basis to dismiss this Adversary, as to Counts One and Two, on the

13  basis of res judicata.  Sidhu v. Flecto Co., 279 F.3d 896, 900 (9th Cir. 2002).

14         A similar result pertains as to Count Three, the Trustee's equitable subordination

15  claim.  The Defendant alleges that its inequitable conduct was litigated in the Surcharge trial,

16  and relitigation of said conduct should now be barred by res judicata.  Under the Sidhu factors,

17  however, it is apparent that the equitable subordination claim is not barred.  First, this claim is

18  entirely different than the surcharge claim.  It does not arise out of the same transactional

19  nucleus of fact; rather, the facts at issue in the equitable subordination claim are much broader

20  than those in the Surcharge Litigation.  All aspects of the claims are different, from the

21  applicable case and statutory precedents to the necessary elements to prove the respective claims.

22  Second, the rights or interests established in the prior judgment would not be destroyed or

23  impaired by prosecution of the second action.  In the Surcharge Litigation, the Court determined

24

25         **20.** The Court is mindful that the Trustee believes that the Surcharge Litigation reflects
26  sufficient conduct for which this Court should enter a judgment of liability on the equitable
   subordination claim.  For the reasons set forth hereinafter, the Court believes that additional
27  conduct must be shown to enter such a judgment on the merits.

28                                              18

whether the collateral of the Defendant should be utilized to pay the administrative expenses

which the Defendant caused or to which it consented.  In the equitable subordination claim, the

Court will determine whether the Defendant's conduct should result in the Defendant being paid,

irrespective of the previous priority of its claims, only after all other creditors of this estate, be

they secured, priority, or unsecured, have been paid in full.  The interests or rights in the

Surcharge Litigation are separate and distinct and cannot be affected by a judgement on this

claim.  Third, the two suits did not both involve the infringement of an identical right.  Although

the Surcharge Litigation addressed certain specific inequitable conduct, an equitable

subordination claim necessarily looks at the creditor's behavior throughout the bankruptcy case

as a whole, and may examine pre-petition behavior as well.  Finally, because of the broader

sweep of the equitable subordination claim, substantially different evidence must be presented in

this Adversary versus the Surcharge Litigation.  Although there may be some convergence, the

Trustee must present new evidence to succeed on the equitable subordination issue.

Moreover, this Court expressly rejected the notion that the Surcharge Litigation

could include equitable subordination issues.  At the September 2, 2004 surcharge hearing,

counsel for the Debtor argued that the surcharge and equitable subordination issues were the

same.[21]  The Court noted that equitable subordination was not before it, and that the Court could

not, sua sponte, raise an equitable subordination issue when no complaint had been filed.  The

Court noted that it could not reach an equitable subordination claim as quickly as it could other

issues, such as surcharge.  It rejected the offer of Debtor's counsel to file an equitable

subordination claim with a motion to consolidate the subordination claim with the Surcharge

Motions.  The Court informed the parties that equitable subordination was a different issue that

would be dealt with at a different time.  Therefore, the parties were specifically precluded by the

Court from litigating equitable subordination in the context of the Surcharge Litigation.  Because

---

**21.** See Tr. of September 2, 2004 Hearing at 11-12, 51-52, attached as Exhibit 2 to the
Trustee's Response at Adversary Case No. 2:07-ap-00031-SSC Dkt. Entry No. 7.

an equitable subordination claim was not heard, it cannot possibly be barred by res judicata.

The Defendant argues that the issue of its bad faith was also raised before the Bankruptcy Appellate Panel and considered by that tribunal in the context of the Rolling Stock Litigation, and said issue is barred by res judicata. However, as noted above, the Trustee's equitable subordination claim wraps in the allegations made in the Surcharge and Rolling Stock Litigation, but also other allegations of inequitable conduct. It is a global inquiry, not one limited to the Defendant's conduct at issue in the Surcharge and Rolling Stock Litigation only. Furthermore, the Defendant's statement that "[t]he BAP considered the bad faith allegations and did not find that Comerica improperly litigated the Rolling Stock issue, or that Comerica's action was not in bad faith," blatantly misstates the record. The Defendant cites to the Bankruptcy Appellate Panel's Order of April 26, 2005,[22] denying the Examiner's Motion to Dismiss the appeal, as evidence that the issue has been heard and determined. The Panel's April 26 Order is a summary order that draws no conclusions as to bad faith or the impropriety of litigation; rather, it summarily refuses to dismiss the appeal, stating that the motion for sanctions is denied without prejudice and might be presented again after a ruling on the merits. The Panel specifically refused to consider some of the allegations of bad faith because they were based on the orders of the Bankruptcy Court entered only after the Rolling Stock Litigation Order had been entered.[23] The Panel's final order in the Rolling Stock Litigation, entered on September 7, 2006, also does not consider the issue of bad faith.[24] There was no final judgment on the merits of the Examiner's allegations of the Defendant's inequitable conduct. The Court concludes that the Trustee may present evidence on the Defendant's bad faith conduct, including its conduct in the Rolling Stock Litigation.

---

**22.** See Rolling Stock Adversary, Dkt. Entry No. 42.

**23.** See, e.g., Rolling Stock Adversary, Dkt. Entry No. 40, at 2.

**24.** See Id. Nowhere does the opinion address the issue of bad faith.

20

5. Collateral Estoppel

Finally, the Defendant argues that Counts One, Two, and Three must be dismissed as barred by the doctrine of collateral estoppel, or issue preclusion.  Issue preclusion prevents relitigation of issues actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding.  Shaw v. Hahn, 56 F.3d 1128, 1131 (9th Cir. 1995). A prior decision will have preclusive effect when: (1) the issue at stake is identical to an issue raised in the prior litigation; (2) the issue was actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation was a critical and necessary part of the judgment in the earlier action.  Littlejohn v. U.S., 321 F.3d 915 (9th Cir. 2003).  In deciding whether the issue decided at the previous proceeding is identical to the one now sought to be litigated, the court may look to whether there is a substantial overlap in evidence between the two cases, and whether both suits involve application of the same rule of law.  Resolution Trust Corp. v. Keating, 186 F.3d 110, 1116 (9th Cir. 1999).  Collateral estoppel does not attach merely because the same issue is raised in successive suits.  Kourtis v. Cameron, 419 F.3d 989 (9th Cir. 2005). For issue preclusion to apply, "the issues litigated must not be 'merely similar,' but must be 'identical.'" Central Delta Water Agency v. United States, 306 F.3d 938, 953 (9th Cir. 2002); Orff v. U.S., 358 F.3d 1137 (9th Cir. 2004). The burden is on the party asserting collateral estoppel to show that the issue to be precluded is identical to an issue actually litigated and decided in the previous action. Poor Water Products v. Olin Corp., 258 F.3d 1024 (9th Cir. 2001). Furthermore, issue preclusion is inappropriate where the parties have not had a full and fair opportunity to litigate the merits of an issue.  See Allen v. McCurry, 449 U.S. 90, 94-95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

In the Surcharge Litigation, the Court heard evidence on whether the Defendant had caused or consented to certain administrative expenses being incurred which should, in fairness, be paid from its collateral.  The evidence heard by the Court included whether the Defendant had breached the Term Sheet.  However, as noted previously, the Court focused on

the Motions by the Examiner and the Debtor to have administrative expenses of this estate paid from bankruptcy estate assets. Whether the Defendant should be personally liable for the breach of the Term Sheet and for a breach of the covenant of good faith and fair dealing is not identical to, nor was it ever considered by the Court and the parties, in the Surcharge Litigation. The focus of a surcharge motion is whether a party, from an objective or subjective standard, caused or consented to having certain work done for its benefit for which its collateral should be surcharged. In re Debbie Reynolds Hotel and Casino, 255 F.3d 1061, 1066-68 (9th Cir. 2001). The issues to be considered in the Surcharge Litigation did not focus on the breach of the Term Sheet, as a contract, or the Defendant's breach of the covenant of good faith and fair dealing, for which the Defendant should be personally liable. As such, the parties did not have the motivation to, or have a full and fair opportunity to, litigate the issues of the existence of a contract, the intent of the parties, the breach of the agreement, whether the agreement included a covenant of good faith and fair dealing and any breach thereof, whether the estate incurred any damages flowing from either breach, and whether the Defendant should be personally liable for such a breach.

Moreover, although the Court heard some evidence regarding a breach of the Term Sheet as a part of the Surcharge Litigation, the Court did not hear evidence as to whether the Term Sheet was a contract. Furthermore, the Court's finding that a Term Sheet existed and had been breached was not a critical and necessary part of the judgment in the Surcharge Litigation. See Littlejohn, 321 F.3d at 920. As a result, the prerequisites for issue preclusion are not satisfied, and the Defendants cannot be successful in its request to dismiss Counts One and Two.

Count Three also is not barred by issue preclusion. Equitable subordination has not already been litigated and decided in a prior proceeding. As noted above, equitable subordination is a much broader claim than any at issue in the Surcharge or Rolling Stock Litigation alone. Equitable subordination bears a different standard of proof than does surcharge

22

or lien avoidance. An equitable subordination claim is made up of an entirely different set of elements than a claim for surcharge or lien avoidance, and involves the application of different legal standards. As noted previously, the issue of equitable subordination claims were not raised in the Rolling Stock Litigation. Indeed, the Court and parties did not discover how frivolous the Defendant's pursuit of that Litigation was until after the Litigation had concluded. Moreover, as noted above, this Court expressly precluded equitable subordination issues from being raised in the Surcharge Litigation. The Court recognized then, as it does now, that equitable subordination is a separate claim than surcharge, necessarily accompanied by different evidence, and different legal authority. Therefore, Count Three cannot be disposed of under the doctrine of issue preclusion.

B.  Motion for Partial Summary Judgment as to Liability

A motion for summary judgment should be granted if the movant has shown that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056(c). Ruling on a motion for summary judgment necessarily implicates that substantive evidentiary standard of proof which would apply at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). A material fact is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. Procedurally, "the proponent of a summary judgment motion bears a heavy burden to show that there are no disputed facts warranting disposition of the case on the law without trial." In re Aquaslide "N' Dive Corp., 85 B.R. 545, 547 (9th Cir. B.A.P. 1987). Once that burden has been met, "the opponent must affirmatively show that a material issue of fact remains in dispute." Frederick S. Wyle P.C. v. Texaco, Inc., 764 F.2d 604, 608 (9th Cir. 1985). The opponent may not assert the existence of some alleged factual dispute between the parties. Liberty Lobby, 477 U.S. 242 at 252, 106 S.Ct. 2505 at 2512, 91 L.Ed.2d 202. Instead, to demonstrate that a genuine factual issue exists, the objector must produce affidavits which are based on personal knowledge, and

23

the facts set forth therein must be admissible in evidence. <u>Aquaslide</u>, at 547. In addition, summary judgment must be used with care and restraint, <u>Hutchinson v. United States</u>, 677 F.2d 1322, 1325 (9th Cir. 1982), and is reviewed in the light most favorable to the non-moving party. <u>Hifai v. Shell Oil Co.</u>, 704 F.2d 1425, 1428 (9th Cir. 1983).

The Trustee requests that this Court enter summary judgment as to the Defendant's liability on the equitable subordination claim. Although equitable subordination was originally, as its name suggests, a purely equitable remedy, it has since become codified at 11 U.S.C. § 510(c).[25] However, because the nature of the remedy remains equitable, the decision whether to grant or deny subordination rests within the Court's discretion. <u>In re First Alliance Mortgage Co.</u>, 471 F.3d 977, 1006 (9th Cir. 2006).

Equitable subordination is a dramatic remedy, and one that is rarely granted. The seminal case for the modern subordination doctrine is often considered to be the Fifth Circuit's decision, <u>In the Matter of Mobile Steel Company</u>, 563 F.2d 692 (5th Cir. 1977), which established a three-part test for the equitable subordination of claims. Although <u>Mobile Steel</u> was decided prior to codification of Section 510(c), the Ninth Circuit has adopted the <u>Mobile Steel</u> opinion's three-pronged analysis. The findings required to subordinate a claim are as follows: "(1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code." <u>In re First Alliance Mortgage Co.</u>, 471 F.3d at 1006 (citing <u>In re Mobile Steel Co.</u>, 563 F.2d 692, 699-700 (5th Cir.

_____

**25.** 11 U.S.C. § 510(c) provides:
the court may–
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
(2) order that any lien securing such a subordinated claim be transferred to the estate.

24

1   1977)); see also In re Filtercorp, Inc., 163 F.3d 570 (9th Cir. 1998); In re Lazar, 83 F.3d 306 (9th

2   Cir. 1996); Stoumbus v. Kilimnik, 988 F. 2d 949, 958 (9th Cir. 1993), cert. den. 510 U.S. 867.

3   ("The bankruptcy court may subordinate a claim if it finds the claimant engaged in fraud,

4   unfairness or inequity, and the claimant's conduct harmed the debtor or its other creditors").  The

5   level of egregious conduct necessary for equitable subordination is high; even independently

6   tortious and fraudulent conduct does not necessarily rise to the level required for equitable

7   subordination in bankruptcy. In re First Alliance Mortgage Co. at 1007.   The Defendant alleges

8   that the Trustee has not shown the distinct level of malfeasance required to subordinate its claim.

9   This Court agrees that at least as of this date, the Court has insufficient evidence to subordinate

10  the Defendant's claim, but the Trustee has presented sufficient evidence, through prior

11  proceedings in this Court, to allow the equitable subordination claim to remain viable.  As noted

12  at oral argument, the Court believes that the Trustee is close to presenting sufficient evidence to

13  support a prima facie case, which, if not refuted by the Defendant, will support a judgment on

14  the merits.  It now appears that the Trustee must engage in additional discovery and determine

15  whether there is additional conduct by the Defendant which would rise to the level of the

16  egregious conduct that would support such a judgment.

17          The Defendant also argues that equitable subordination is not appropriate

18  because, in adjudicating equitable subordination cases, courts have focused on the nature of the

19  relationship between the debtor and the creditor.  Generally, equitable subordination is employed

20  in cases where a creditor is an insider or manager of the debtor, or where the creditor has

21  exercised substantial control over the debtor.  The Defendant argues that because its relationship

22  with the Debtor falls into none of these categories, its claim cannot be subordinated.  However,

23  the subordination inquiry does not end after a determination of the nature of the creditor-debtor

24  relationship alone.  Rather, a court must examine the claimant's conduct - the controlling factor

25  in an equitable subordination claim.  The parties have cited a few cases in which non-insider,

26  non-manager, non-fiduciary creditors' claims were subordinated.  See In re 604 Columbus

27

28                                              25

1  <u>Avenue Realty Trust</u>, 968 F.2d 1332, 1362 (1st Cir. 1992), <u>In re Osborne</u>, 42 B.R. 988, 996-97

2  (W.D. Wis. 1984).

3          Where the facts and circumstances shock the conscience of the Court, the doctrine

4  of equitable subordination will be applied to subordinate the claims of non-management and

5  non-insider creditors.    <u>In re 604 Columbus Avenue Realty Trust</u>, 968 F.2d 1332, 1362 (1st Cir.

6  1992).  To justify subordination, non-insider conduct must detrimentally affect other creditors,

7  and "evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary."

8  <u>Id.</u> at 1360.  Actual fraud is not required; rather, "the minimum level of conduct appears to be

9  conduct that shocks the conscience of the court."  <u>Id.</u> at 1361.  This level of conduct "has been

10  variously described as 'very substantial' misconduct involving 'moral turpitude or some breach

11  of duty or some misrepresentation whereby other creditors were deceived to their damage,' . . .

12  or as gross misconduct amounting to fraud, overreaching or spoliation.  However, the distinction

13  between "inequitable conduct" and "gross misconduct" (possibly involving "moral turpitude")

14  would seem to be a difficult one to draw in practice. . . The key factor would appear to be

15  misrepresentation on which other creditors relied to their detriment."  <u>In re Osborne</u>, 42 B.R.

16  988, 996-97 (W.D.Wis. 1984).

17          For example, in the case of <u>In re Osborne</u>, the Wisconsin District Court ordered

18  equitable subordination based on the lender's misrepresentations to another creditor about that

19  creditor's prospects for payment.  The lender had made a new loan to a struggling cattle rancher,

20  and the lender was responsible for paying the cattle rancher's other creditors.  Although the

21  lender knew that the cattle rancher was struggling and likely unable to pay the creditors, the

22  lender encouraged them to continue dealing with the rancher (thus improving its own prospects

23  for payment).  The Court held that equitable subordination was appropriate, reasoning that the

24  relationship between rancher and lender was so close as to be seen as a "joint venture."

25  Although the debtor bore a heavy burden in attempting to subordinate the claim of the non-

26

27

28                                                          26

insider and non-fiduciary lender,[26] the close involvement of the lender in the debtor's operations and relations with other creditors convinced the Court that subordination was appropriate. Id. at 996. The key factor was the misrepresentation upon which the other creditors relied. Id. at 997.

The Court may consider any inequitable act during the bankruptcy proceeding as a basis on which to subordinate a claim. In re Mobile Steel Co., 563 F.2d 692, 699-700 (5th Cir. 1977). Pre-bankruptcy behavior is often taken into account in an equitable subordination analysis. See In re First Alliance Mortgage Co., 471 F.3d 977, 1006 (9th Cir. 2006); In re 604 Columbus Avenue Realty Trust, 968 F.2d 1332 (1st Cir. 1992); In re Osborne, 42 B.R. 988, 1000 (W.D. Wis. 1984). In this case, however, the Trustee has pled only post-petition inequitable conduct. The pre-petition conduct of the Defendant is certainly one area for the Trustee to now explore.

While the Court must find that the three-prong test adopted by the Ninth Circuit In re First Alliance Mortgage Co. has been satisfied, the Court is also dealing with a non-insider, non-fiduciary creditor in the case at bar which may require additional factors be found by the Court before it may enter a judgment equitably subordinating the claim of the Defendant. For instance, to warrant subordination of the Defendant's claim, the conduct at issue must rise above bad faith or inequitable conduct to "shock the conscience of the court," and must be proven with particularity, and must detrimentally affect other creditors. See In re 604 Columbus Avenue Realty Trust, 968 F.2d 1332; In re Osborne, 42 B.R. 988.

---

**26.** The Osborne Court appears to have lifted this notion from In re Teltronics Services, Inc., 29 B.R. 139 (Bankr.E.D.N.Y. 1983). However, the Court's summary of Teltronics somewhat misstates that case's holding. The Teltronics court actually held that the burden of proving all elements of subordination was on the objectant, and that the objectant bore the burden of proving, by a preponderance of the evidence, that the claimant's conduct was so substantially inequitable to the debtor's other creditors that subordination was warranted. Id. at 169-70. In other words, where an equitable subordination case involves a non-insider creditor, the objectant bears the burden of proving that the creditor's conduct was in bad faith, or was some other type of egregious - not merely inequitable - conduct. Thus, the Osborne Court seems to have used the term "burden of proof" in a loose manner to equate it with the term "burden of going forward with evidence."

Case 2:07-ap-00031-SSC    Doc 13    Filed 08/30/07    Entered 08/30/07 14:13:25    Desc
Main Document    Page 27 of 33

Under the first prong of the <u>First Alliance</u> test, the Defendant must have engaged in some type of inequitable conduct. Inequitable conduct may be the "breaching of existing, legally recognized duty arising under contract, tort or other area of law [and] . . . in commercial cases, the proponent must demonstrate a substantial breach of contract and advantage-taking by the creditor." <u>In re 80 Nassau Associates</u>, 169 B.R. 832, 840 (Bankr. S.D.N.Y 1994). It seems apparent from the Surcharge Litigation that the Defendant acted inequitably in just such a manner. From the beginning of the case, the Defendant made misrepresentations on which other creditors relied. For example, the Defendant asserted that it was secured by a lien on substantially all the Debtor's assets when it was not. This representation was never corrected, and the Court and other creditors relied on this information in the context of stay relief, adequate protection and other motions.

Such overreaching behavior became most apparent after the Defendant moved for, and obtained, the appointment of the Examiner and then pressed this Court to expand the Examiner's powers to allow the Defendant to proceed with its business plan. The Defendant requested that the Examiner undertake certain actions, such as streamlining the Debtor's operations, because it planned to exploit the Examiner to accomplish its bankruptcy strategy of liquidating the Debtor as a going concern. Later, when it became apparent that this would not happen, the Defendant again used the Examiner as a means to liquidate estate collateral and accomplish its own business goals. In escalating the amount of the administrative expenses, which expenses were largely incurred for the benefit of the Defendant, yet refusing to resolve the then accruing administrative expenses as originally negotiated with the Examiner, the Defendant soon was competing with other creditors for the limited estate resources. The Defendant's litigation counsel and some of its top executives entered into the Term Sheet to encourage the Examiner to settle the administrative expense claims, but the Defendant later breached that Term Sheet. In essence, the Examiner had acted in reliance on the Term Sheet, had settled various claims as a result thereof, and then found that the Defendant improperly started to include

various terms to the agreement that were never assented to by the parties.

Later, when the Examiner filed fee applications for himself and his professionals, the Defendant objected to the requests, and attempted to assert that the Examiner's actions had been unnecessary or wasteful. The Defendant attempted to use the Examiner for its own purposes while the estate paid for those services. The Defendant ultimately objected to the very actions it had requested the Examiner undertake. And when the Examiner filed an adversary proceeding against the Defendant, it alleged that the Examiner lacked the power to do so, despite having expressly requested the appointment of an Examiner with the power to prosecute actions on behalf of the estate. These attempts to deny the Examiner and the estate the rights to which they were entitled, after the Defendant had advocated for the vesting of those rights, were clearly undertaken in bad faith. The Defendant increased dramatically the estates' administrative costs by pursuing such wrongful and meritless objections.

Said conduct exemplifies the kind of aggressive behavior toward other creditors that equitable subordination is intended to remedy. For example, in <u>Osborne</u> and <u>604 Columbus</u>, the Courts subordinated creditors' claims, focusing on the creditors' misrepresentations to other creditors or the creditors' actions to improve their positions at the expense of other creditors; whereas in the <u>First Alliance</u> case, the Ninth Circuit held that the creditor's claim should not be subordinated because, among other reasons, the creditor had not jockeyed to improve its position as a creditor once the bankruptcy had been filed. In the case at bar, the Defendant has clearly maneuvered within the bankruptcy case, through its misrepresentations, overreaching, taking inconsistent legal and factual positions, and its obstinacy, to attempt to obtain a better position for itself at the expense of other creditors.

Finally, conduct involving the Defendant's representations regarding its collateral, and its behavior regarding the Examiner is wasteful and inequitable. It certainly, in some cases, rises to the level of bad faith. As discussed above, after the conclusion of the Rolling Stock Litigation, this Court was alerted to the fact that the Defendant knew that it had no

chance of winning that Litigation, and that it would cost more to pursue the Litigation than to settle it. However, the Defendant chose to pursue the Rolling Stock Litigation anyway, and to appeal the result, driving up administrative costs for the already insolvent estate. And the Court can see no basis, other than bad faith, for the Defendant to have added an additional term to the Term Sheet, so that the Examiner, the Debtor and the creditors of this estate would be forced to incur additional costs of litigation in settling administrative expenses and attempting to get such legitimate expenses paid.

Under the second prong, of the equitable subordination test, it must be shown that the Defendant's misconduct injured creditors or gave it an unfair advantage. As noted above, the Defendant encouraged the Examiner to spend estate resources negotiating settlements with administrative creditors, and then repudiated its agreement. However, it is unclear how to quantify the impact of this misconduct on the creditors of this estate. The estate was harmed through the Defendant's conduct, but the Surcharge Litigation may have remedied that harm by utilizing the Defendant's collateral as a basis to pay those claims caused or generated at the request of the Defendant. Additionally, the Defendant affected other creditors by needlessly pursuing the Rolling Stock Litigation and driving up the estate's administrative costs. However, was this harm effectively vitiated by the Surcharge Litigation? Would there have been payment in full of the administrative expenses and a return to unsecured creditors but for the Defendant's conduct?

Certainly, the Defendant attempted to confer an unfair advantage upon itself; it attempted to use the Examiner to accomplish its business strategy. It also attempted to use the Examiner to negotiate settlements, discounting the administrative claim total so that more estate assets would remain to satisfy its own claim. The Defendant argues that no unfair advantage was conferred upon it because its recovery from the bankruptcy estate is insignificant compared to the amount paid on the claims of administrative creditors. However, the amount of recovery as compared to administrative creditors - one of whom the Defendant actually moved to appoint - is

30

not the appropriate touchstone for comparison. Rather, the Court must consider the effect of the Defendant's conduct on the recovery of all creditors. The Defendant attempted to better its position at the expense of other creditors by using the Examiner to achieve certain actions that would otherwise have required the Defendant to expend resources of its own. The fact that such strategy ultimately drove up administrative costs, reducing the recovery of all creditors including the Defendant, does not preclude the Defendant from having obtained an unfair advantage over other creditors. Again, however, the Court has insufficient evidence to quantify the effect of the Defendant's conduct on the recovery that creditors would have received. Certainly if it can be shown, as the Court described above, that a prompt distribution of the estate assets of $8 million, as envisioned by the Examiner and the Debtor, would have resulted in a greater return to creditors, and that Defendant's conduct injured those creditors or allowed the Defendant to obtain some type of unfair advantage over those creditors, then the Trustee may provide sufficient evidence to support the second prong of the test.

Under the third prong of the test, subordination must not be inconsistent with the Bankruptcy Code. Although the cases generally do not devote much discussion to this third prong, it is generally thought to relate to the allocation of the burden of proof. <u>Mobile Steel</u>, 563 F.2d 692, 701 (5th Cir. 1977). The allegations must contain some substantial factual basis, and the plaintiff must come forward with sufficient evidence to overcome the <u>prima facie</u> validity of the claimant's proof of claim and compel the claimant to prove "the validity and honesty of the claim." <u>Id.</u> If the claimant succeeds with the requisite showing, the plaintiff then bears the burden of proving that the claimant's conduct was so egregiously inequitable to other creditors that its claim should be subordinated. <u>In re Osborne</u>, 42 B.R. 988, 1000 (W.D. Wis. 1984).

Other courts have construed the third prong to indicate that equitable subordination may not be used as a sanction. The doctrine of equitable subordination is remedial in nature, not penal, and it should be applied only to the extent necessary to offset specific harm creditors suffered as a result. <u>Matter of Fabricators, Inc.</u>, 926 F. 2d 1458, 1464 (5th Cir. 1991),

31

citing In re Westgate-California Corporation, 642 F. 2d 1174 (9th Cir. 1981). The Defendant argues that to the extent it has harmed creditors or acted in bad faith, these transgressions were satisfied by surcharging its collateral. Certainly the surcharge compensated the estate for certain harms; however, given the broad scope of the Defendant's inequitable, bad faith conduct throughout the pendency of this bankruptcy case, it is possible that certain damage has escaped unredressed. Additionally, as the Trustee progresses with discovery, he may reveal previously unknown facts regarding uncompensated damage to the estate.

The Surcharge and Rolling Stock Litigation reflect many inequitable actions committed by the Defendant which indicate that it may be appropriate to subordinate the Defendant's claims to those of other creditors of this estate. However, this issue has been presented to the Court in the context of a motion for summary judgment. Summary judgment must be used with care and restraint, Hutchinson v. United States, 677 F.2d 1322, 1325 (9th Cir. 1982), and is reviewed in the light most favorable to the non-moving party. Hifai v. Shell Oil Co., 704 F.2d 1425, 1428 (9th Cir. 1983). While the Defendant's behavior militates strongly toward subordination, there remains a question about the extent of uncompensated damage that creditors suffered as a result of the Defendant's actions. It is unclear whether such harm has already been compensated. Additionally, there remains some doubt whether the Defendant's actions were egregious enough to warrant subordination. The element of "moral turpitude" or behavior that is "shocking to the conscience of the court" must be proven with more particularity than has been presented. The Court concludes that partial summary judgment as to liability is not appropriate.

## IV.  Conclusion

Based upon the foregoing analysis, the Court must deny the Defendant's Motion to Dismiss as to Counts One, Two, Three, and Four of the Trustee's Complaint. Furthermore, the Trustee's Motion for Partial Summary Judgment as to liability on the claim of equitable

1   subordination is denied.  Although the evidence weighs strongly in favor of equitable

2   subordination, the facts have not yet revealed the gross and egregious level of misconduct

3   required for the Court to subordinate the Defendant's claim, nor has the Trustee alleged

4   uncompensated damage to creditors of the estate with sufficient specificity.

5         The Court will execute a separate order incorporating this Memorandum

6   Decision.

9         DATED this 30th day of August,  2007.

                                          *Sarah Sharer Curley*

12                             Honorable Sarah Sharer Curley

13                             U. S. Bankruptcy Judge

15   BNC to notice.

33