# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re<br><br>GTI CAPITAL HOLDINGS, LLC, an Arizona limited liability company dba ROCKLAND MATERIALS, G.H. Goodman Investment Companies, LLC, an Arizona Limited Liability Company,<br><br>Debtors.<br>_____<br>In Re<br><br>DAVID M. REAVES, as the Trustee of GTI CAPITAL HOLDINGS, LLC, an Arizona limited liability company dba ROCKLAND MATERIALS, G.H. Goodman Investment Companies, LLC, an Arizona Limited Liability Company,<br><br>Plaintiffs,<br>vs.<br><br>COMERICA BANK-CALIFORNIA, as successor by merger to Imperial Bank,<br><br>Defendant. | In Proceedings Under Chapter 7<br><br>Case Nos. 03-07923-SSC through 03-07924-SSC<br><br>Jointly Administered Cases<br><br>Adv. No. 03-00583;<br>Adv. No. 07-00031<br><br>MEMORANDUM DECISION DENYING MOTION FOR STAY PENDING APPEAL - MANDAMUS<br>(Expedited Decision Requested –Oral Argument Waived) |

1

**I. Preliminary Statement**

This matter comes before the Court on a "Request for Stay Pending Appeal - Mandamus and Request for Expedited Stay Hearing, Or Sua Sponte Order" ("Motion for Stay") filed on March 17, 2008 by Triad Commercial Captive, Stirling Bridge LLC, New York Newport, and Teri and Grant Goodman (the "Goodman parties"). The Goodman parties request that the Court "stay the proceedings" and "request immediate imposition of the stay." The Goodman Parties further state that they will appeal from the "judgments, orders, or decrees of bankruptcy judge...entered in this adversary proceeding on the 17th day of March 2008." The Goodman parties filed their "Notice of Appeal" concurrently with the Motion for Stay. David Reaves, the duly appointed Chapter 7 Trustee and Plaintiff in this proceeding, filed and served his Response on March 20, 2008. On March 21, 2008, the Goodman parties filed their Reply. The Goodman parties request that this Court expedite a decision on their Motion for Stay and do not request oral argument. The Trustee has also not requested oral argument on the Motion for Stay. The Court has reviewed the underlying pleadings filed and served by each side, and considers this matter ready to be disposed of without further argument or briefing. The Court has set forth its decision on the Motion for Stay hereinafter.[1] To the extent necessary, it has set forth its findings of fact and conclusions of law. Fed. R. Bank. P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334 and 157.

**II. Factual Discussion**

On February 22, 2008, the Trustee filed a "Motion to Approve Settlement Agreement" ("Settlement Agreement"). The Trustee sought Court approval of a Settlement Agreement with Comerica Bank-California, the Defendant in several adversary proceedings

---

**1.** The Court has not considered the Goodman parties' argument on the issues of mandamus, recusal, qui tam, or other items simply strung together by Mr. Goodman. Those matters are not before this Court.

2

("Comerica").[2] The Settlement Agreement contemplated (1) the dismissal of the Trustee's claims in Adversary Proceeding 2:07-ap-00031;[3] (2) the dismissal of the Trustee's Appeal in Adversary Proceeding 2:03-ap-00583;[4] and (3) a general release of the claims between the parties. As a part of the Motion to Approve the Settlement Agreement, the Trustee also sought the Court's approval of the attorneys' fees in the amount of $316,666.66, and costs in the amount of $1,929.76, to be paid to Michael W. Carmel, Ltd. (the "Firm"), for its representation of the Debtor, and later the Trustee, in the aforesaid Adversary Proceedings. The Trustee also filed a Notice of Hearing on February 22, 2008, advising interested parties that a hearing would be conducted on the Settlement Agreement between the Trustee and Comerica on March 11, 2008, with any objections or responses to the relief requested to be served and filed by Thursday, March 6, 2008.[5] The Settlement Agreement Motion did not have the underlying Agreement attached to it, because the parties had just finished mediation. However, the parties advised the Court and interested parties that the executed Settlement Agreement would be filed shortly. A certificate of mailing avowing that the Motion for Settlement Agreement and the Notice of Hearing were duly served on the interested parties, including the Goodman parties, was filed with the Court on February 25, 2008.[6] Mr. Goodman, on behalf of the Goodman parties, filed his objection the morning of the hearing

---

**2.** *See* Docket Entry No. 40 in Adversary 07-00031.

**3.** The parties have referred to this litigation as the "Equitable Subordination Litigation," focusing on the relief sought by the Trustee that the claims of Comerica be equitably subordinated to the claims of other creditors.

**4.** The parties have referred to this matter as the "DePrizio Litigation," as a result of the relief sought, at one time, by the Debtors that Comerica had received certain alleged preferences. The preference claim was dismissed by this Court, with prejudice, but the estate's claim for a fraudulent conveyance was taken up by the Trustee. At the time of the settlement, the Trustee had appealed this Court's dismissal, with prejudice, of the final claim of the estate involving a fraudulent conveyance allegedly received by Comerica when it perfected its security interest on certain personal property of the Debtors.

**5.** *See* Docket Entry No. 41 in Adversary 07-00031.

**6.** *See* Docket Entry No. 42 in Adversary 07-00031.

on March 11, 2008. Even though Mr. Goodman filed his Objection that morning, the Court allowed him to be heard at the 10:00 a.m. hearing.

There were two very important reasons why the hearing on the Settlement Agreement was set for March 11, 2008. First, this Court had scheduled a two-day trial in the Equitable Subordination Litigation for March 11 and 12, 2008, which required that the Trustee and Comerica file their joint pretrial statement with the Court on March 4, 2008.[7] Because the parties were requesting that the two-day trial be vacated, the Court scheduled the hearing, on the Settlement Agreement, for what would have been the first day of the trial[8] The Court was also advised at the March 11, 2008 hearing that there was some urgency that the Settlement Agreement matter be heard in Mid-March, since the Bankruptcy Appellate Panel of the Ninth Circuit ("BAP") had set oral argument on the appeal filed by the Trustee concerning the dismissal of the DePrizio Litigation filed against Comerica. Counsel stated that they needed to notify the BAP by March 28, 2008, as to whether the Trustee's appeal would be dismissed as a result of the Settlement Agreement. Therefore, counsel needed to have the Settlement Agreement approved prior to the March 28 date.

The Court also needs to revisit some of the issues previously addressed by it, since the Goodman parties seem to have a misunderstanding, or a lack of memory, as to what has happened in this case. Mr. Goodman, as the principal of GTI Capital Holding, LLC, and GH Goodman Investment Cos., LLC (the "Debtors" or "Debtor") filed a Chapter 11 petition for each Debtor on May 8, 2003. The Debtors' cases were subsequently administratively consolidated. The Debtors were given the opportunity to continue with their operations. Early in the proceedings, Comerica requested the appointment of an Examiner who soon took over financial

---

**7.** *See* Minute Entry dated October 4, 2007, Docket Entry No. 19, in Adversary Proceeding No. 07-00031

**8.** In the District of Arizona Bankruptcy Court, it is not unusual to set a hearing on a settlement agreement for the date and time of the trial. The matter should either be settled or the parties should be ready to commence the trial as indicated.

4

oversight of the operations. The Examiner was a party selected by the United States Trustee's Office, after consultation with the interested parties in the case, and the Court approved that appointment. By the fall of 2003, the Examiner had serious concerns about the Debtors' ability to continue with their operations. Although Mr. Goodman and the Goodman entities believed that they could raise capital to keep the Debtors' operating or they could sell the Debtors' assets for a substantial amount of money, neither event occurred.

Ultimately, in what is a final order of this Court, the Debtors' assets were sold for an aggregate amount of $8 million.[9] It is important to consider how those funds were allocated, because it is critical to understanding why the Trustee settled these matters along the lines described by him. Of the $8 million, it was determined that the proceeds of the sale would be allocated as follows: $950,000 to the Deer Valley Property, which would be an unencumbered asset; $1,010,851 to the "rolling stock" vehicles upon which Comerica asserted a lien which was being challenged by the Examiner, $32,046 to the "rolling stock equipment" which was subject to separate Comerica liens, $4,685,110 to the liens held by Comerica on the Debtors' other real property assets which were not subject to avoidance, $2,234,940 allocated to the lien asserted by Comerica on certain equipment which the Debtor and the Examiner believed were subject to possible avoidance as a preference or fraudulent conveyance, and $37,053 in inventory.[10] After the hearings on April 15, 2004, and May 27, 2004, on the issue of asset allocation of the sale proceeds and the appropriate amount of an interim payment to Comerica for its liens on the 43rd Avenue Property and the Buckeye Property, which were not subject to challenge, the Court entered an Order, dated June 14, 2004, approving the allocation and authorizing the payment of $2,661,000 to Comerica for its liens on the Real Property.[11] Of importance is the fact that after

---

**9.** *See* Docket Entry No. 594 in the Administrative Case.

**10.** *See* Docket Entry No. 699 in the Administrative Case.

**11.** *See* Docket Entry No. 775. (Docket Entry No. 781, dated June 18, 2004, appears to be a duplicate.) At the time of the May 27, 2004 hearing, Mr. Goodman and the Goodman parties withdrew their objection on the record.

5

the sale, there were limited cash funds available for immediate distribution to all creditors.[12] The Examiner then undertook the difficult task of asking those entities that had administrative expense claims, as of the sale of the Debtors' assets, to reduce their claims. Ultimately, the claims were reduced, with the Flood Control District of Maricopa County reducing its claim in excess of $2 million to a claim of little more than$100,000.[13]

Subsequently litigation ensued on a variety of fronts. The Examiner pursued the "rolling stock" litigation and ultimately set aside the lien of Comerica on certain vehicles.[14] Those funds, previously allocated to Comerica, became unencumbered for distribution to the creditors. The Debtors, with the assistance of Mr. Goodman as the principal, and the Examiner pursued Surcharge Litgation against Comerica. This Litigation also resulted in this Court entering an order surcharging the collateral of Comerica to pay those administrative expenses consented to by Comerica or which Comerica caused to be undertaken for which it received a benefit. Again, a detailed Memorandum Decision was entered by this Court on this matter, which was appealed. This Court was affirmed on appeal.[15]

---

**12.** *See* Docket Entry No. 691 in the Administrative Case. Separate from the sale proceeds, the Examiner held $684,916 in cash, which he attributed to the liquidation of the Debtors' accounts receivable. The Examiner estimated that an additional $1,430,881 remained in accounts receivable to be collected, but they were of dubious value, and were subject to the liens of Comerica and Orix Credit. (Orix had an estimated secured claim of $635,000.) There were certain preference payments to be pursued in the amount of $5,000,000, and pre- and post-petition transfers to insiders of $2,624,874. However, the Examiner believed that there would be various costs incurred in litigating such matters. Overall, the Examiner allocated $4,771,846 to all of the real property held by the Debtors ($950,000 of this amount was allocated to the Debtors' unencumbered Deer Valley Real Property), and $3,228,102 to the personal property, including equipment and vehicles held by the Debtors.

**13.** *See* Docket Entry No. 750 in the Administrative Case.

**14.** *See* Memorandum Decision and Order Incorporating at Docket Entry Nos. 21 and 22 in Adversary Proceeding No. 05-00676. *See* Orders from Bankruptcy Appellate Panel affirming Decision at Docket Entry Nos. 40 and 42.

**15.** *See* Memorandum Decision and Order Incorporating at Docket Entry Nos. 1232 and 1233 in Administrative Case. See Docket Entry No. 1460: Order from Bankruptcy Appellate Panel affirming Decision.

6

But let's be clear. The Debtors and the Examiner did not choose to request a surcharge as to every administrative expense incurred by the Debtors' estates. The Court also determined that if the Debtors or the Examiner wished to pursue Comerica on the basis of the Bank having received a preference or a fraudulent conveyance, they could certainly do that, but that type of administrative expense claim for attorneys' fees that would necessarily arise was not something that Comerica consented to or that Comerica caused for which it received a benefit, so expenses for such litigation could not be surcharged against Comerica's collateral.

It was also clear to the parties, including the Debtors, that since a portion of the sale proceeds had been allocated to the personal property collateral upon which Comerica held a lien, which lien was subject to avoidance as a preference or a fraudulent conveyance (also known as the DePrizio litigation), those allocated funds would retain the lien of Comerica until, and only if, the Comerica lien were set aside. Unfortunately for the Debtors, the Bankruptcy Code was amended in 2005 which eliminated the Debtors' ability to set aside the lien of Comerica as a preference.[16] The Court allowed the Debtors to continue with the request that the lien of Comerica be set aside, on certain personal property, as a fraudulent conveyance. It was this claim that the Trustee ultimately pursued and which was a part of the Settlement Agreement heard on March 11, 2008.

However, given the contentious nature of these proceedings, the administrative expense claims of principally the Examiner and the Examiner's counsel were increasing dramatically. And, as has been noted, not all of the other administrative expense claims previously incurred by the estates had been a part of the Surcharge Litigation. There were also taxes to be paid, concerning the sale of the Debtors' real property, which were administrative expenses. The Examiner, thus, began a series of distributions to the administrative expense claimants, on a pro rata basis.[17] Ultimately the Examiner was able to distribute the net sum of

---

**16.** *See* Docket Entry No. 34 in Adversary Proceeding No. 03-00583.

**17.** *See* Docket Entry Nos. 1296 and 1299 in the Administrative Case. The following claimants received distributions on their claims: Bombardier Capital, Inc., $32,565.02; Trade

7

$807,707.52, allocated to the Deer Valley Property,[18] the sum of $1,010.851, which had been allocated to the rolling stock litigation, after the Examiner set aside the lien of Comerica on said personal property, and the sum of $1,609,877.55 as a result of the Surcharge Litigation.[19] The Examiner and his counsel believed that said distributions in the aggregate amount of $3,428,436.07 were mandated, since many of the creditors had settled with the Examiner on the basis that they would be paid on an expedited basis. Of course, these requests for distributions led to objections by Comerica or, in some cases, by the Debtors concerning the Examiners' or his counsel's attorneys' fees, which only led to more attorneys' fees being created. The Examiner had also concluded that Comerica had a viable lien on the 43rd Avenue and the Buckeye property in the allocated amount of $4,685,100,[20] and the Examiner used a portion of the allocated sale proceeds, in the amount of $2,661,000, to make a partial payment to Comerica on its real property liens.[21] If the Court simply adds $3,428,436.07 and $4,685,110, that equals an amount that is approximately $8,113,546. Thus, even though the Debtors' assets only had a value of $8,000,000, at the time of sale, once the Examiner started making distributions to creditors, he was validly "surcharging" or using Comerica's collateral to pay creditors.

At the hearing on March 11, 2008, on the Settlement Agreement, the Trustee testified that he was then holding in excess of $1.2 million and that only 66 percent of the Chapter 11 administrative expense claims had been paid. Of the over $1.2 million that he was holding, he

---

Payables, $ 48,902.27; Flood Control District of Maricopa County, $37,118.45; Arizona Department of Revenue, $6,236.50; Nation's Rent, Inc., $4,619.89; Hawley Aktinson & Company, $3,711.84; James Carmichael, $4,189.02; Hebert Schenk, PC (net of retainer), $232,250.65; CBIZ Restructuring Group, $96,665.21; FTI Consulting, Inc., $26,996.44; Baker & McKenzie, $40,720.71; Bryan Cave LLP, $446,047.09.

**18.** The Examiner needed to pay real and personal property taxes and other amounts prior to a distribution.

**19.** *See* Docket Entry No. 1296 in the Administrative case.

**20.** *See* Docket Entry Nos. 699, 775, and 781 in the Administrative Case.

**21.** *See* Docket Entry Nos. 775 and 781 in the Administrative Case.

8

testified that the approximate sum of $600,000 was unencumbered and that the sum of $620,000 (roughly) had been allocated as proceeds upon which Comerica held a lien, but which had been allocated to the personal property as a result of the Sale Order and which could only be retained if the Trustee were successful on the remaining fraudulent conveyance claim in the DePrizio Litigation.

Of course, the Court had already dismissed the fraudulent conveyance claim in the DePrizio Litigation, with the Trustee having filed a notice of appeal as of the March 2008 hearing. But the reality was, and the Trustee so testified, that he believed that he would not be successful on the appeal. Thus, without the Settlement Agreement, and given the prior Orders of this Court on the Sale and allocation of the proceeds, if the Trustee were not successful on appeal, he would have been required to return the sum of $620,000 to Comerica. To the extent the Goodman parties somehow believed that the sum of $620,000 belonged to the estate as unencumbered assets that could be distributed to creditors, they were mistaken.

The Goodman parties also seem to misunderstand the nature and extent of the claims that are still unpaid in this case. The Trustee testified, on March 11, 2008, that there were Chapter 7 administrative expense claims of the Debtors' estates held by the Trustee and Trustee's counsel that had to be paid, and that only 66 percent of the Chapter 11 administrative expense claims, even after the settlements reducing the amount outstanding on many of these claims were approved, had been paid at this time. If the Settlement Agreement were approved, the Trustee estimated that the Chapter 7 administrative expenses would be paid, and the Chapter 11 administrative expense claimants would be paid 90 percent of their claims. No payments would be made to unsecured creditors, which included the Goodman parties. Even if the Trustee proceeded with the DePrizio and the Equitable Subordination Litigation and won on all claims, with the Court finding, as a matter of fact and law, that the Debtors had incurred $1.4 million in damages as a result of Comerica's actions, the Trustee testified that the claims against the Debtors' estates were so great that the unsecured creditors would receive a *de minimus* distribution. Given the risk involved, the Trustee proceeded with a mediation of the controversy

9

and settled the remaining claims.

The Court also made it clear at the March 11, 2008 hearing that the claims in the remaining Litigation belonged to the estates, with the Trustee having the power to settle those claims, with due deference to the opinions of creditors. Given the insolvency of the estates and the unlikely event that there would ever be a distribution to the unsecured creditors, the Court approved the Settlement Agreement. However, to the extent the Goodman parties had any independent claims against third parties, they could pursue those claims. Thus, the terms and conditions of the release were considered at the time of the March 11, 2008 hearing and modified by the Court.

The Court also needs to provide some background information as to the Firm's retention. In August 2006, Mr. Goodman was the principal of the Debtors. Pursuant to various Court orders, as noted, the Debtors' assets had been liquidated, but the Debtors were still in Chapter 11 proceedings, and the Examiner was still trying to wind-up the estates. Counsel for the Debtors in August 2006 sought to withdraw, but knew the Debtors, as entities, needed to retain substitute counsel. On August 31, 2006, the Debtors filed a motion for substitution of counsel.[22] The motion attached a letter dated August 29, 2006, setting forth the specific terms of the engagement of the Firm. The Court conducted a hearing on the motion on September 5, 2006, and then another hearing on September 19, 2006. Mr. Goodman appeared at both hearings, and raised no objection to the terms of the retention of the Firm. As a part of the engagement, the Firm requested a one-third (1/3) contingent fee. At the hearings, the Court explored the risk involved with pursuing the DePrizio and other litigation on behalf of the Debtors, and it was clear that no other law firm wished to undertake the representation of the Debtors, given the substantial likelihood of loss by the Debtors and the estates. The Court granted the Debtors' motion at the September 19, 2006 hearing, and executed an Order Appointing Counsel on October 5, 2006, incorporating the terms of the Firm's retention, including the one-third (1/3) contingent fee. The

---

**22.** *See* Docket Entry No. 1363 in the Administrative Case.

10

Firm's retention contemplated that if a trustee were subsequently appointed in a Chapter 7 proceeding for the Debtors' estates, the trustee could determine whether to continue the retention of the Firm. Thus, the Firm also undertook the additional risk that it would provide valuable services to the Debtors' estates, but a trustee subsequently appointed in this case, if converted, would choose another law firm to continue with the estates' litigation. However, in this case, the Trustee who was appointed, after a conversion to Chapter 7, chose the continued retention of the Firm on behalf of the estates. Now Mr. Goodman, as one of the Goodman parties, somehow believes that the retention was unfair or unethical.

The Court has reviewed the affidavits filed by the Firm in support of its request for $316,666 in attorneys' fees and $1,929.76 in costs.[23] One affidavit reflects the Mr. Carmel, on behalf of the Firm, expended 124.80 hours in Adversary Proceeding No. 03-00583. The other Affidavit reflects that Mr. Carmel, again on behalf of the Firm, expended 199.7 hours in Adversary 07-00031. This is roughly 325 hours in two Adversaries. The Affidavit also included a statement of costs in the Adversaries. Dividing $316,666 by 325 hours is $974 per hour. The bankruptcy attorneys in Arizona usually request in the neighborhood of $400 to $425 per hour for Chapter 11 proceedings and similar complex work. Given the fact that the Firm undertook the risk of representing the Trustee in Litigation for which, if the Trustee lost, the Firm would receive nothing, the Court concludes that the rate of $974 per hour is appropriate and consistent with the analysis in In re Reimers, 972 F.2d 1127, 1128 (9th Cir. 1992).

Returning to the Settlement Agreement between the Trustee and Comerica, even though the Goodman parties filed an Objection[24] after the date set forth in the Notice of Hearing concerning the Settlement Agreement, the Court gave them the opportunity, at the March 11, 2008 hearing, to set forth their arguments on the record and to cross examine the Trustee on the evidence presented by him in favor of the Settlement. However, the Court must now place the

---

**23.** *See* Docket Entry No. 47 in Adversary Proceeding No. 07-00031.

**24.** According to the Electronic Docket, the Goodman parties filed their Objection at 4:02 a.m. on March 11, 2008.

11

Goodman parties' Objection in context. This is an insolvent estate in which not even the Chapter 11 administrative expense claimants shall be paid in full. Not one of the administrative expense claimants objected to the Settlement. Only the Goodman parties, with unsecured claims that would receive a *de minimus* distribution if the Trustee were successful on all claims in the DePrizio and the Equitable Subordination litigation, interposed an objection to the Settlement Agreement.

At the conclusion of the hearing, the Court set forth an overview of its decision, advising the parties that it would follow-up with a written decision. The Court concluded that the Settlement Agreement should be approved, with certain changes in the release language, and directed the Trustee to upload an order that addressed the Goodman parties' concerns regarding the claims of third parties. The Court also directed the Firm to file an affidavit setting forth the time that it expended on the Adversary Proceedings and the costs incurred. On March 17, 2008, the Court entered a Memorandum Decision, approving the Settlement Agreement, with the modification of the release language as noted on the record, and approving the attorneys' fees and costs requested by the Firm.[25] The Court also entered a separate Order granting the Settlement Agreement, as well as an Order authorizing payment of the Firm's attorneys' fees and costs on March 17, 2008.[26]

### III. Legal Discussion

Discretionary stays of judgments and orders pending appeal are governed by Fed.R.Civ.P 62(c) & (g), Fed.R.App.P. 8(a) & (b), Fed.R.Bankr.P. 8005, and In re Wymer, 5 B.R. 802 (Bankr. 9th Cir. 1980). In the Ninth Circuit, in order to prevail, the party seeking the stay must prove: 1) appellant is likely to succeed on the merits; 2) appellant will suffer irreparable injury; 3) no substantial harm will come to appellee; and 4) the stay will do no harm to the public interest. In re Wymer, 5 B.R. 802 (Bankr. 9th Cir. 1980); In re Irwin, 338 B.R. 839

---

**25.** *See* Docket Entry No. 51 Adversary Proceeding No. 07-00031.

**26.** *See* Docket Entry Nos. 52 and 53 Adversary Proceeding No. 07-00031.

12

(E.D. Cal 2006). The party moving for a stay has the burden on each of these elements. Irwin at 843; In re Doctors Hosp. of Hyde Park, Inc., 376 B.R. 242 (Bankr.N.D.Ill.,2007). A motion for stay pending appeal is an extraordinary remedy and requires substantial showing on part of the movant. In re Lickman, 301 B.R. 739 (Bankr. M.D. Fla. 2003).

In this case, the Goodman parties provide no basis to stay these proceedings while their appeal is pending. Moreover, the Motion fails to satisfy or even address any of the elements necessary to prevail on a such a Motion.

### A. Notice

Addressing the notice issue raised by the Goodman parties in their Reply to their Motion for Stay, the Court has already set forth above, in the Factual Discussion, that the Motion and the Notice of Hearing were sent out to creditors, including the Goodman parties, on February 22, 2008, well in advance of the March 11, 2008 hearing. The Court has also stated, in this Decision, that when parties request a trial, they must be ready to proceed on that date to present evidence or present a settlement to the Court. The parties chose to present the Settlement Agreement to the Court on the first day of trial. As previously discussed by this Court, the two-day trial was set back in October 2007, well in advance of the start of the trial in March 2008. In this matter, the Trustee and Comerica also had a concern about having the Settlement Agreement heard before they were to report back to the BAP as to whether the DePrizio Litigation had been settled. Since this is leap year, 18 days' notice was provided to the Goodman parties and to the other creditors of these estates. No one objected other than the Goodman parties who had little to gain even if the Trustee won on all remaining claims in the Litigation.

### B. Procedure

The Goodman parties also cite to the Court's Local Rules as evidence that something is amiss. First, the national rules, the Rules of Bankruptcy Procedure, do not provide for a date certain for the response concerning a motion or a contested matter. *See* Fed. R.Bankr. P. 9013 and 9014. Local Rule 9013-1(c) only allocates 15 days after service to serve and file an objection or response to a motion. If the Court includes an additional 3 days in mailing, as a part

13

of the noticing process and as provided in Bankruptcy Rule 9006(f), the Trustee still provided 18 days' notice to the creditors and the Goodman parties prior to the March 11, 2008 hearing on the Settlement Agreement. In this case, Court allowed the Goodman parties to present their Objection at the time of the hearing. Moreover, the Trustee did place the bar date for objections or responses in the Notice of Hearing, which is permitted by Local Rule 9013-1(j), and which is an exception to Local Rule 9013-1(c). So, although the Goodman parties believed that the Trustee did not comply with the Local Rules, he did.

Bankruptcy Rule 2002, a national Bankruptcy Rule, does provide that creditors shall have "20 days' noticing by mail" of a hearing on "approval of a compromise or settlement." *See* Fed. R.Bankr. P. 2002(a)(3). However, Bankruptcy Rule 9006(c), with or without a motion and with or without a hearing, allows the Court to shorten the notice set forth under Rule 2002 (a)(3). In this case, the start of a two-day trial on March 11, 2008, allowed the Court to place the Settlement Agreement on the calendar at the start of the trial. Bankruptcy Rule 9005 also incorporates Fed. R. Civ. P. 61. Thus, if the setting of the Settlement Agreement on 18 days' notice was in error, it was a harmless error. Fraidin v. Weitzman (In re Fraidin), 188 B.R. 529, 532, note 1(D. Md. 1995), *aff'd* 110 F.3d 59 (4th Cir. 1997); In re Sunflower Racing, Inc., 226 B.R. 665 (D. Kan. 1998) (unless shortening the noticing period would materially alter the presentation of evidence by the party so complaining, the Court's error was harmless).

Under the rubric of "procedure", the Goodman parties also believe Local Rules 9072-1, et seq., have been violated. First, the Mediation Program, under the Local Rules, is voluntary, and may take a variety of forms. This matter was not assigned to mediation under Local Rule 9072-2, so the Goodman parties' recitation of numerous Local Rules as to a more formal mediation procedure were not consented to by the parties, nor ordered by this Court. Local Rule 9072-1 does allow the parties to determine the appropriate format to settle their matter, which may include that another judge of this Court assist them in an expedited, cost-effective manner. Therefore, the Court finds no violation of Local Rules 9072-1, et seq., in this matter.

14

Moreover, the Court's conclusion that the Goodman parties' Objection was of little merit and did not require that the Objection be set over for a further hearing was within the Court's discretion. Indeed the Local Rules specifically provide that if the Court believes that the response or objection has no merit, in that no material issues of fact are raised, the Court may summarily rule on the Objection, disposing of it, if necessary, without a further hearing. *See* Local Rule 9014-2(a). In this matter, the Court allowed Mr. Goodman and the Goodman parties to be heard on their Objection. The Court allowed evidence to be presented, out of an overabundance of caution, on a meritless objection. After evaluating the evidence presented, and consistent with the Ninth Circuit case law concerning settlements, the Court concluded that given the contentious nature of these proceedings, the Trustee's business judgment and evaluation of the claims under a Woodson analysis, and the unlikelihood that even the Chapter 11 administrative expense claimants, the real parties in interest, would ever be paid in full, the Court concluded that approving the Settlement Agreement was in the best interest of creditors. The Court also determined that it need not set any further hearings on the Settlement Agreement.

### C. **Likelihood of Success on the Merits**

Turning to the various factors concerning a stay pending appeal, the Court concludes that the Goodman parties have failed to show that their appeal is likely to succeed on its merits. The Court set forth its findings of fact and conclusions of law in its March 17, 2007 Memorandum Decision which is incorporated herein. As the Court noted, the Debtors, and now the Trustee, have engaged in contentious litigation with Comerica that has occurred over a number of years and has been time-consuming and expensive. In his testimony before the Court at the hearing on the Settlement Agreement, the Trustee carefully considered the remaining claims that the estates had against Comerica and the difficult issues the estates would encounter in proceeding with the DePrizio and the Equitable Subordination Litigation. For instance, the Trustee did not believe that the probability of his overturning this Court's dismissal, with prejudice, of the preference and fraudulent conveyance claims in the DePrizio Litigation was great. He also noted that the appeal of the dismissal of that Litigation would be time-consuming.

15

As to the Equitable Subordination Litigation, the Trustee conceded that although he had retained an expert to quantify the potential damages that might have been suffered by the estates when Comerica breached its term sheet with the Examiner, then acting on behalf of the Debtors' estates, he believed that the liability issues would be difficult to prove. He estimated that he was likely to lose on the issue of liability, because he was unsure whether he had a viable contract claim on which to proceed. If true, no Court would ever reach the issue of damages. He also conceded that the equitable subordination claim, which was another count in the complaint, was difficult to prove in the Ninth Circuit. It should also be noted that in this Court's August 30, 2007 Memorandum Decision in the Equitable Subordination Litigation, which the Goodman parties like to rely on, the Court concluded that it was unclear whether the Trustee would be able to present enough evidence to meet the stringent standard in the Ninth Circuit on equitable subordination. Indeed, the Court did not grant the Trustee's motion for partial summary judgment on the claim, noting that it needed something more than a mere recitation of what happened in the Surcharge Litigation.[27] Because of the Trustee's uncertainty in being able to prove an equitable subordination claim, he proceeded with the settlement of this claim.

To the extent that the Trustee had any doubts about his analysis of the DePrizio and the Equitable Subordination Litigation, he participated in a mediation session with Comerica's principals and counsel which only confirmed the weaknesses that he envisioned. Using his business judgment, the Trustee concluded that the Settlement Agreement was in the best interest of creditors. Therefore, the Court concluded, at the hearing on the Settlement Agreement, that the resolution of all claims that existed between the estate and Comerica, through the Settlement Agreement, had a tangible benefit to these estates that could not be overlooked.

---

**27.** For instance, the Court pondered, in its August 30, 2007 Memorandum Decision, whether the remedy imposed on Comerica of surcharge was sufficient for the actions taken by Comerica in this case. If Comerica's collateral were surcharged to pay certain administrative expense claimants, what additional actions would be required to impose the additional remedy of equitable subordination? At least on his motion for partial summary judgment, the Trustee had failed to show those additional facts which would warrant an additional Draconian remedy of subordination.

16

The Court found that the Settlement Agreement met the criteria set forth in the decision of <u>In re Woodson</u>, 839 F.2d 610, 620 (9th Cir.1988) for the approval of compromises. Moreover, the Court had wide discretion in granting approval of compromises between trustees and creditors. <u>In re Sanner Contracting Co.</u>, 181 B.R. 465 (Bankr.D.Ariz.,1995).

Yet the Goodman parties have failed to provide this Court with any countervailing argument or evidence that would support any different conclusion on its current Motion for Stay. The Goodman parties now argue that somehow the mediation was in violation of "Rule 9072." There is no national Bankruptcy Rule on this point, so the Court will turn to its Local Rules. There is nothing in Local Rule 9072-1, <u>et seq.,</u> which prohibits a judge of this Court as acting as a mediator in proceeding over which he or she is not presiding. The Trustee and Comerica apparently approached Judges Case and Haines to serve as a mediator in the dispute, and Judge Haines consented. The Court sees no basis for this to be a violation of the Bankruptcy Court's Mediation Program. In fact, the program does allow the judges of this Court to serve as mediators. *See* Local Rules 9072-6 and 9072-7. The Court has already discussed the noticing of the hearing on the Settlement Agreement, and the other procedures utilized. The Court sees no basis for the designated noticing and procedural matters to result in a likelihood of success on the merits. The Court concludes that the Goodman parties are not likely to succeed on the merits of their appeal.

### D. <u>Failure to Show Irreparable Injury to Appellant</u>

The Goodman parties also fail to show that they will suffer irreparable harm if a stay is not granted. The Court has reviewed the Motion, and there is no indication of any irreparable injury or even a discussion of the issue. Given that the Goodman parties are unsecured creditors in an insolvent estate, it is difficult to imagine what possible benefit they would receive even if the Trustee continued to pursue the Litigation to a successful resolution. As noted previously, the only parties that would benefit would be the Chapter 11 administrative expense claimants, and they have not objected to the Settlement Agreement. In essence, the

17

Goodman parties have nothing to lose by continuing to increase the expenses of these estates. However, this does not mean that the Court should somehow equate their "nothing to lose attitude" with any type of harm or injury.

### E. Failure to Show No Substantial Harm to the Appellee

The Goodman parties have also failed to show that no harm will be suffered by the Trustee and, therefore, the estates, if the stay is granted. In reality, staying the proceedings will only serve to delay a distribution to administrative expense claimants who have been waiting years for some type of resolution of the remaining Litigation and will delay the winding-up of this estate. Additionally, an insolvent estate will be forced to incur the costs of a frivolous appeal, and the parties who will pay for such an appeal will be the administrative expense claimants who have not objected to the Settlement Agreement. Moreover, Trustee's counsel, the Firm, which undertook the prosecution of the DePrizio and Equitable Subordination Litigation against Comerica at great risk would have to wait until the resolution of the appeal before receiving the attorneys' fees and costs due to the Firm.

### F. Failure to Show that the Stay will do No Harm to the Public Interest

As to the final factor concerning stays pending appeal, the Goodman parties have failed to provide any evidence that the stay will do no harm to the public interest. Not unlike the other factors, the Goodman parties have failed to address this factor. In this particular case, after years of litigation, it is the best interest of creditors that the Settlement Agreement be approved and that the Trustee may finally make another distribution that the administrative expense claimants have awaited.

### G. The Firm's Attorneys' Fees and Costs

To the extent that the Goodman parties also raise an issue about the payment of the Firm's attorneys' fees and costs, the Court must deny their request for a stay. As noted previously, the Debtors had great difficulty in locating any counsel that would undertake their representation in August 2006. When the Firm agreed to be substitute counsel, it was after

18

several hearings at which the Debtors' principal was present. This same principal is now a member of the Goodman parties and counsel for said parties. Surely if he knew of any reason why the Firm should not be retained for the Debtors, he should have so stated. It is only now, after several years have passed, and the Settlement Agreement has been presented to the Court, that the Goodman parties now raise any ethical concerns. To the extent that they had those concerns, the Court independently sought, and reviewed, the affidavits from the Firm outlining the attorneys' fees and costs requested to consummate the Settlement Agreement. Given the risk assumed by the Firm, the Trustee's statement at the evidentiary hearing on the Settlement Agreement that he believed that the services rendered by the Firm were excellent and that the compensation requested was reasonable, and the affidavits presented by the Firm as to the services rendered by the Firm and the costs incurred, the Court concludes that the compensation requested is consistent with the Ninth Circuit decision of In re Reimers, 972 F.2d 1127, 1128 (9th Cir. 1992).

        Nor have the Goodman parties shown that an hourly rate, in a contingent fee matter, that is twice the normal rate of a bankruptcy attorney in Arizona for a similar type of work, with the hours expended as set forth in Affidavits, somehow is a violation of he Arizona ethical rules that are incorporated into the Local Rules of the Arizona Bankruptcy Court.[28] The Goodman parties have presented no evidence or argument on this issue that would cause this Court to issue a stay pending appeal preventing a payment to the Firm.

        Based upon the foregoing,

        The Court denies the Goodman Parties' Motion for Stay Pending Appeal. This Court is unable to address the issues of mandamus, etc., which are not before it. The Court will execute a separate order incorporating this Decision.

---

**28.** The Goodman parties, in their Reply, assert that the Firm is receiving $3,000 to $4,000 a hour. There is no support for that assertion.

19

DATED this 4th day of April, 2008.

_____

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

BNC to notice.

20